(No. 14865.—Judgment affirmed.)

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* HENRY KNIGHT, Plaintiff in Error.

*Opinion filed April 18, 1923.*

1. CRIMINAL LAW—*when possession of stolen property is sufficient to convict of larceny.* Possession of stolen property soon after the larceny is *prima facie* evidence of the guilt of the person in whose possession it is found and is sufficient to warrant a conviction unless the possession is explained in such manner as at least to raise a reasonable doubt of guilt, which is a question for the jury to determine.

2. SAME—*when judgment of conviction of larceny will not be reversed.* Where the stolen property is found upon the defendant and the evidence for the People is sufficient to warrant a conviction of larceny, the judgment will not be reversed where no error of law is shown in the record and nothing appears to have occurred during the trial to prejudice the jury against the defendant.

3. SAME—*record may be amended to show indictment was returned into open court.* On review of a criminal case the record may be amended in the trial court to show the proper organization of the grand jury and the return of the indictment in open court, and a supplemental record showing such facts may be filed by the People.

WRIT OF ERROR to the Circuit Court of Edgar county; the Hon. AUGUSTUS A. PARTLOW, Judge, presiding.

DYAS & REDMAN, for plaintiff in error.

EDWARD J. BRUNDAGE, Attorney General, GEORGE W. BRISTOW, State's Attorney, and JAMES B. SEARCY, for the People.

Mr. JUSTICE FARMER delivered the opinion of the court:

Henry Knight, Edward Knight, John Smith and Ralph Lazelle were indicted by the grand jury of Edgar county, at the February term, 1922, for the larceny of one steer of the value of $75, the property of Scott Baker. Henry Knight was tried and convicted under the indictment at

the June term of the Edgar county circuit court, 1922, and has sued out this writ of error to review the judgment.

As the principal ground urged by defendant for a reversal of the judgment is that the verdict and judgment were not warranted by the testimony, it will be necessary to refer to the substance of the evidence.

Henry Knight (who will hereafter be referred to as defendant) was a farmer operating a farm of 120 acres owned by him and on which he lived. He is a widower with two children,—a daughter about fourteen years old, and a son, Edward, who, as we understand, was older than the daughter but was a minor. They lived with their father on the farm. He also had a hand employed, John Smith, and Ralph Lazelle seems to have been living with him at the time the alleged larceny was committed. Scott Baker is a farmer residing about four or four and one-half miles west of defendant and on the same public road. Baker had twenty steers on his farm, and on the morning of November 23, 1921, he discovered one of the steers was gone. He also discovered a gap was opened in the fence along the public road and that horse-tracks had gone in and out of the gap, and there were tracks of a steer leading from the pasture through the gap into the public road. The horse-tracks had a peculiar dip in the toe in front unlike ordinary horse-tracks. Baker testified he followed the horse and steer-tracks east toward defendant's farm, to the house of Ben Dwyer, which was a mile and a fraction west of defendant's house. He there called Sol Berry, a constable and deputy sheriff, who lived between one and two miles from Dwyer's. From Dwyer's, Berry and Baker followed the horse and steer-tracks to the defendant's house, where they arrived at about seven o'clock in the morning. The tracks went through the gate into the barn lot at defendant's house. The road runs east and west on the north side of defendant's barn. They found the steer in a shed on the south side of the barn. Berry opened the door and

the steer came out. They let him out into the road and the steer went back to Baker's farm. He had the appearance of having been heated up, had partly cooled off but was still damp. The steer weighed over 1000 pounds and was worth $75. Witness compared the tracks of the horse from his farm to defendant's house with tracks made by a horse of defendant which they found in his barn and they were exactly the same. He described the peculiarity of the tracks which made them different from the ordinary horse-tracks. He did not measure the tracks of defendant's horse with a rule but did with a pencil, and the tracks compared perfectly with those he had followed from his farm to defendant's house. The horse of defendant which was found in the barn had been heated up during the night and was still damp.

Sol Berry testified he joined Baker at Dwyer's house and he and Baker followed the horse and steer-tracks to where they went into defendant's barnyard. He described the peculiarity of the horse-tracks which made them different from ordinary horse-tracks. When they arrived at defendant's house they did not see him but found the steer in a shed on the south side of the barn. When the witness opened the door of the shed the steer ran out, and when the gate from the barn lot to the road was opened the steer went out into the road and went directly to Baker's farm. The steer looked like he had been driven pretty hard and was "frosty like." Witness and Baker went down the road a fourth of a mile where they met Erwin Winn and Dwyer. They talked about the steer, how he looked, and figured he had been stolen. Baker and witness then went back to defendant's house. They found him back of his house three or four hundred feet, fixing a fence, told him it was thought the steer had been stolen, and they would like to compare his horse's tracks with the tracks that appeared to have followed the steer from Baker's farm. Defendant said he thought there was no use of that, and witness told him the

steer had been stolen and defendant had better let them have the horse to examine his tracks, and defendant consented to do so. Defendant went in the barn, saddled the horse and took it out. It was the only horse then in the barn, his other horses being out in the pasture. The saddle was still wet. There was a cattle-whip lying on the saddle. Defendant rode the horse down the road about a mile and a half and back again. Witness measured both sets of tracks, and those made by the horse ridden by defendant and those by the horse which was followed from Baker's farm to defendant's house were just the same. Witness described the peculiarity of the tracks and said he had never seen any other hoof like it.

Erwin Winn testified he was present when the horse-tracks were measured, and the tracks made by the horse of defendant and those that appeared to have followed the steer from Baker's farm were the same. He described the peculiarity of the tracks which distinguished them from ordinary horse-tracks.

Ben Dwyer testified he sold the horse to defendant, and that the tracks of defendant's horse and the tracks that followed the steer from Baker's farm were just the same. He described the peculiarity of the tracks of the horse he sold to defendant which made them different from the ordinary horse-tracks.

The foregoing, in brief, is the substance of the People's testimony.

Henry Knight testified in his own behalf that he was a deputy sheriff for his township and had been assessor for six years. He was at home the night of November 22, 1921, and that his son, daughter, Smith and Lazelle were there. He did not go away from his house during the evening. His son, Smith and Lazelle left the house on horseback, riding the defendant's horses, soon after supper. One of them,—as we understand it, Smith,—rode the horse which made the peculiar tracks. Charles Roberts, Ed

Watkins and Ben Fennell came to his house early in the evening and they played rook. His son, Smith and Lazelle returned about nine o'clock. All joined in the game of rook and played until 12:00 or 12:30, when Roberts, Fennell and Watkins went home and witness and the other three boys played until about 2:30, when they went to bed. He got up about daylight the next morning, made a fire and went to the barn. The horse that made the peculiar tracks was in the barn, had been ridden but was not particularly warm. He went back to his house, and while eating breakfast he saw his cattle some distance down the road in the highway and with them was a steer. He called his cattle up to the barn and the steer came with them. He drove the cows in the lot and then into the back lot and left the steer in the barn lot. The steer jumped the fence and got in with the cows. He drove them all back to the barn lot and put the steer in what he referred to as the "jack pen," which he said was the only place he could keep him. That was about seven o'clock in the morning, and he then went to fix his fence along the road where the cattle had broken through. He didn't see Baker and Berry when they came and got the steer. He saw them when they came back and wanted the horse to make tracks in the road. He said he did not think it was necessary, but after talking a few minutes he agreed to ride the horse down the road. Baker and Berry measured the tracks. The witness denied knowing anything about how the steer got with his cattle. He testified that he did not drive him from Baker's pasture to his home, and that the first time he ever saw the steer was when he saw him with his cattle down the road, west of his house.

Charles Roberts and Ben Fennell testified they and Eddie Watkins went to defendant's house November 22, about 7:30 or 8:00 in the evening; that defendant's son, Smith and Lazelle left on horseback a few minutes after they arrived; that they played rook at the defendant's house until about 12:00 or 12:30; that the son, Smith and Lazelle re-

turned to defendant's house about nine o'clock and played rook until the witnesses left; that defendant, his daughter and the three boys mentioned were at defendant's house when the witnesses left.

Defendant called several witnesses to prove his general reputation for honesty and integrity. Several of them testified it was good, and some of them would not answer directly and unequivocally.

There can be no doubt Baker's steer passed out of the field through the gap in the fence into the public road and went east about four or four and a half miles to defendant's farm. It would be unreasonable to suppose he would leave the herd he was with and wander off that distance unless someone was driving him. The evidence warrants the conclusion that the horse that made the tracks going in and out of the gap in Baker's fence was ridden by someone and that the rider drove the steer out of the field and east along the public road as far as defendant's farm. There was a peculiarity about the horse-tracks which corresponded exactly with tracks made by the defendant's horse which was found in his barn early in the morning of November 23. The horse and steer bore evidence of having been recently heated from travel and the saddle found in the barn with the horse was damp from recent use. The jury were warranted in concluding that someone riding defendant's horse drove Baker's steer from his farm to the defendant's farm. Notwithstanding the defendant's testimony that he first saw the steer with his cattle in the road west of his house, they having broken through his fence, Baker and Berry had no difficulty in following the horse and steer-tracks to and through defendant's barn gate into his barn lot. The steer was shut up in a shed, or what defendant called a "jack pen," on the opposite side of the barn from the road, and when let by Baker and Berry into the public road he went directly back to Baker's farm. These facts tend strongly to support the presumption which arises from the possession

of recently stolen property. It is a familiar and well settled rule of law in criminal cases that possession of stolen property soon after the larceny is *prima facie* evidence of the guilt of the person in whose possession it is found, and is sufficient to warrant a conviction unless such possession is explained in such manner to at least raise a reasonable doubt of guilt. (*Williams* v. *People,* 196 Ill. 173; *Miller* v. *People,* 229 id. 376; *People* v. *Everett,* 242 id. 628.) Defendant offered an explanation of how the steer came into his possession, and it was for the jury to determine whether his explanation was of a character to raise a reasonable doubt of his guilt of stealing the animal. In view of all the facts and circumstances proved, a reviewing court cannot say defendant's explanation was sufficient to raise a reasonable doubt of his guilt. Nothing appears to have occurred during the trial to cause any passion or prejudice on the part of the jury toward defendant but the verdict was the result of a dispassionate consideration of the testimony. In the absence of any error of law a reviewing court would not be warranted in reversing the judgment. *Bonardo* v. *People,* 182 Ill. 411; *People* v. *Schoop,* 288 id. 44; *People* v. *Grosenheider,* 266 id. 324; *People* v. *Capello,* 282 id. 542; *Graham* v. *People,* 115 id. 566.

One of the errors assigned is that the record does not show the indictment was returned by the grand jury into open court. Since the record was filed it has been amended in the trial court and a supplemental record filed by the People which shows the proper organization of the grand jury and the return of the indictment in open court.

It is also contended the court erred in refusing two instructions offered by defendant. The court did not err in refusing the instructions. The law was fully and fairly stated in the instructions given by the court, and defendant was not prejudiced by any instruction given or refused.

The judgment is affirmed.

*Judgment affirmed.*